IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Korell Battle,                          )
                                        )
                    Plaintiff,          )        Civil Action No.2:12-cv-2476-CMC-BHH
                                        )
        v.                              )        **REPORT AND RECOMMENDATION**
                                        )        **OF MAGISTRATE JUDGE**
Darryl King, Jan Pittman, and SCDC,     )
                                        )
                    Defendants.         )
_____)

The Plaintiff, a state prisoner proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983. This matter is before the Court upon Defendants' Motion for Summary Judgement (Dkt. No. 26) and Plaintiff's Motion to Amend (Dkt. No. 45).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate for consideration.

The Plaintiff brought the instant action on or about August 24, 2012. (See Dkt. No. 1.) On February 12, 2013, Defendants filed a Motion for Summary Judgment. (Dkt. No. 26.) By order filed February 14, 2013, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Plaintiff was advised of the summary judgment procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt. No. 27.) Plaintiff filed his Response in Opposition to the Motion for Summary Judgment on or about March 19, 2013. (Dkt. No. 35.) After Plaintiff filed his Response, the undersigned issued an order denying Defendants' Motion for Protective Order. (See Dkt. No. 37.) That same day, the following text order was filed:

TEXT ORDER re 26 MOTION for Summary Judgment, 35 Response in Opposition to Motion for Summary Judgment. Plaintiff filed his 35 Response in Opposition to the 26 Motion for Summary Judgment on or about March 19, 2012. (Dkt. No. 35.) On March 28, 2013, the undersigned issued an 37 Order denying Defendants' Motion for Protective Order. Pursuant to that Order, Defendants have until 4/17/2013 to respond to Plaintiff's discovery requests.

It is therefore ORDERED that Plaintiff shall have through 5/7/2013 to supplement his 35 Response in Opposition to the Motion for Summary Judgment. AND IT IS SO ORDERED.

(Dkt. No. 38.)

From the time those two orders were filed on March 28, 2013, Plaintiff has filed several documents, most of which concern discovery matters. (See Dkt. No. 40; Dkt. No. 41; Dkt. No. 47.) The Plaintiff's Motion "for Production of Documents" (Dkt. No. 41) and Motion to Compel (Dkt. No. 47) have since been denied. (Dkt. No. 49.) Although Plaintiff filed a Motion to Amend (Dkt. No. 45) after the two orders of March 28, 2013, he has not supplemented his Response in Opposition to Defendants' Motion for Summary Judgment.

## **PROCEDURAL FACTS**

Plaintiff, who is currently housed at Perry Correctional Institution, alleges claims pursuant to 42 U.S.C. § 1983 and state law for events that allegedly occurred while Plaintiff was incarcerated at Lieber Correctional Institution ("LCI" or "Lieber") in the Special Management Unit ("SMU"). (See Compl.) Plaintiff alleges that on October 14, 2010, while he was incarcerated in the SMU at Lieber, Sergeant Aranda came to Plaintiff's cell door around lunchtime to pass out juice. (Dkt. No. 1 at 3 of 12.) Plaintiff states that, as Aranda was pouring juice into Plaintiff's cup, Plaintiff "pretended jokingly to grab the edge of the pitcher" Aranda was holding, and Aranda "snatched [the] pitcher back and juice from [the] pitcher splashed on [Aranda's] shirt." (Id.) Plaintiff alleges that Lt. Skipper, who "was also passing out lunch, acted defensively and maced [Plaintiff] in [the] face and shut the flap." (Id.) Plaintiff states that, after being maced, he went to the sink and washed the mace off his face and out of his eyes. (Id.)

According to Plaintiff, Lt. Stuart came to Plaintiff's cell after lunch "after things calmed down" and told Plaintiff that Stuart had to put Plaintiff "in the black restraint chair for assaulting his officer." (Id.) Plaintiff states, "I refused to back up to [the] flap to get cuffed

because I felt like I did not assault [an] officer, and felt that if I violated a rule then it should have been [written] up." (Id.) Plaintiff alleges that after several hours passed, the shifts changed (at approximately 6 P.M.), and officers turned off the water in his cell. (Dkt. No. 1 at 4 of 12.)

Plaintiff alleges that, at approximately 10 P.M., Defendant King came to Plaintiff's cell "and told [Plaintiff] to back up to the flap" because Plaintiff "was going to the black restraint chair for [the] incident earlier that day with Sgt. Aranda." (Id.) Plaintiff "refused to back up to [the] flap," and Plaintiff had his window flap covered so [King] could not see in his cell and "had [his] window flap rigged up to where [King] could not open it from outside." (Id.) Plaintiff states, "King opened up [the] door from outside and told [the] response team to come in and get me to put me in a chair for alleged assault on Aranda earlier." (Id.) Plaintiff alleges (verbatim),

> 18. I had a ink pen, with a thin ½ inch metal pen chip off pen 1 sharpened, attached to pen, and I started swinging it at the shield and the chip broke off. I did not stab Norris with it and he was not hurt.
>
> 19. Officers backed me up into cell and got me pinned against back wall and desk and I hit Officer Norris 1 time in his face shield he had over his face.
>
> 20. Officers had pinned me to [the] floor and hit me, and restrained me by putting cuffs on my hands behind my back and shackles on [my] ankles, and I quit resisting.
>
> 21. King maced me while I was cuffed on floor behind my back.
>
> 22. After officers put cuffed/shackled on me they picked me up and put me in black restraint chair.

(Dkt. No. 1 at 4 of 12.)

According to Plaintiff, the mace was "burning [his] eyes and all over [his] head and chest and back," and he asked King if he could take a shower or wash the mace out of his eyes before going into the chair; King said no. (Dkt. No. 1 at 4-5 of 12.) Plaintiff contends

that he asked Nurse Pittman ("who [Plaintiff] could not see due to mace in [his] eyes"), while she was checking his cuffs, to wash the mace out of his eyes, but she told him no. (Id. at 5.) Plaintiff alleges that Pittman "said to sit still for 30/45 minutes and it would . . . cool down," but he "listened to her advice and that did not work." (Id.) Plaintiff states, "Mace was burning my face, eyes, head, back, chest, and had dropped down to my bottom area and [was] burning my testicles and buttocks and was all up in my nose and my mouth." (Id.) Plaintiff alleges that he was in "extreme pain and agony" and "was having breathing difficulties," but when he cried and screamed for help, no one would help him. (Id.)

Plaintiff alleges that King refused to let Plaintiff out of the restraint chair until approximately 5:30 A.M. the following day, such that Plaintiff was "strapped down" for six to seven hours. (Dkt. No. 1 at 6 of 12.) Plaintiff alleges that, even after he was taken out of the chair, he was still not able to properly wash the mace off his face and body because staff stripped his room, taking everything out of it for 72 hours. (Id.) Plaintiff states that he had no soap, washcloth, or towel to wash away the mace, and staff would not give him a shower. (Id.) Plaintiff alleges he was in his cell for three days with no blankets and with mace all over his body. (Id.)

Plaintiff seeks to establish causes of action for, *inter alia*, violation of his Eighth Amendment rights, gross negligence, negligence, and assault and battery. (Dkt. No. 1 at 9-10 of 12.) Plaintiff seeks compensatory damages, punitive damages, and injunctive relief. (See id. at 11-12 of 12.)

## APPLICABLE LAW

### Summary Judgment Motion Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue'

4

exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" Id. (quoting Hunt v. Cromartie, 526 U.S. 541, 552 (1999)); see also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

Defendants contend they are entitled to summary judgment for several reasons; the undersigned addresses their arguments below.

### A. Failure to Exhaust Administrative Remedies

Defendants first contend summary judgment in their favor is appropriate because Plaintiff failed to exhaust his administrative remedies. (See Dkt. No. 26-1 at 5-6.) The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Through the enactment of this statute, "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." Booth v. Churner, 532 U.S. 731, 741 (2001); see Porter v. Nussle, 534 U.S. 516 (2002); Larkin v. Galloway, 266 F.3d 718 (7th Cir. 2001) (exhaustion required even though the plaintiff claimed he was afraid); see also Claybrooks v. Newsome, 18 Fed. App'x 243 (4th Cir. Sept. 18, 2001) (applying Booth v. Churner to affirm the district court's denial of relief to the plaintiff).

"[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative

process . . . , the process that exists on paper becomes unavailable in reality." <u>Zander v. Lappin</u>, 415 Fed. App'x 491, 492 (4th Cir. Mar. 10, 2011) (quoting <u>Kaba v. Stepp</u>, 458 F.3d 678, 684 (7th Cir. 2006)). The district court is "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials." <u>Id</u>. (quoting <u>Aquilar-Avellaveda v. Terrell</u>, 478 F.3d 1223, 1225 (10th Cir. 2007)).

Along with their Motion for Summary Judgment, Defendants attached the Affidavit of Ann Hallman, Branch Chief of the Inmate Grievance System with the South Carolina Department of Corrections ("SCDC"). (<u>See</u> Dkt. No. 26-8.) Ms. Hallman states in her Affidavit that Plaintiff filed a Step 1 grievance (Grievance ECI-9185) concerning the October 14, 2010, matters on October 28, 2011. (Hallman Aff. ¶ 3.) She states that this grievance "was returned to him unprocessed because he failed to properly submit his grievance through the Inmate Grievance Coordinator as required by SCDC policy," and that Plaintiff "never properly submitted a Step 1 grievance concerning the October 14, 2010 matters." (<u>Id</u>. ¶¶ 4-5.) According to Hallman, Plaintiff "appealed and filed a Step 2 grievance" on November 10, 2011, but this Step 2 "grievance was also unprocessed for failure to properly submit his grievance as required by SCDC policy." (<u>Id</u>. ¶¶ 6-7.) Ms. Hallman attached Plaintiff's grievances to her Affidavit. (<u>See</u> Dkt. No. 26-8 at 3-4 of 4.)

Plaintiff opposes summary judgment on the ground that he failed to exhaust his administrative remedies. Plaintiff states in his Affidavit that he filed a Step 1 grievance on October 15, 2010, but the "warden did not respond" despite the passage of over ten months. (Dkt. No. 35-2 at 7 of 14.) Plaintiff also states that Ms. Jenkins was the Inmate Grievance Coordinater at Lieber, and Plaintiff "was having problems with her." (<u>Id</u>.) Plaintiff states,

> I patiently waite[d] for about 9½ months from 10/15/2010 to 8/1/2011 for [the] Step 1 grievance to be sent back with a response form Lieber Warden, but received none so I refiled the Step 1 grievance and sent a copy of it to the Inmate Grievance Branch.

(<u>Id</u>.) Plaintiff asserts that he "waited 2 more months," from August of 2011 to November of 2011, and "still did not receive a response," so he "refiled another Step 1 and sent a copy

to the grievance branch." (<u>Id</u>.) According to Plaintiff, Hallman answered his first "refiled Step 1 grievance" on November 1, 2011. (<u>Id</u>.) Although Plaintiff's handwriting is difficult to read, it appears he contends that Hallman returned that grievance "unprocessed since [Plaintiff] did not submit" it to the Inmate Grievance Coordinator at Lieber. (Dkt. No. 35-2 at 7-8 of 14.) Plaintiff asserts that Hallman did not attach a copy of this grievance to her affidavit. (Dkt. No. 35-2 at 8 of 14.) According to Plaintiff, the grievance attached to Hallman's affidavit was actually his second "refiled Step 1 grievance," which James Simmons returned to Plaintiff unprocessed because Plaintiff "did not submit it to Jenkins at Lieber." (<u>Id</u>.)

On these disputed facts, the undersigned cannot conclude that Defendants are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies. Plaintiff presented evidence that he submitted a Step 1 grievance on October 15, 2010, but that he "was having problems with" the Inmate Grievance Coordinator at Lieber. (<u>See</u> Dkt. No. 35-2 at 7-8 of 14.) In <u>Dole v. Chandler</u>, 438 F.3d 804, 809 (7th Cir. 2006), the Eighth Circuit stated, "Prison officials may not take unfair advantage of the exhaustion requirement, . . . and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." <u>See also Hill v. O'Brien</u>, 387 Fed. App'x 396 (4th Cir. 2010) (finding a genuine issue of material fact regarding whether the defendants hindered the plaintiff's ability to exhaust his administrative remedies); <u>Jernigan v. Stuchell</u>, 304 F.3d 1030, 1032 (10th Cir. 2002) (failure to timely respond to a grievance may render an administrative remedy unavailable). This is not to say that Plaintiff actually exhausted his administrative remedies. However, the undersigned cannot conclusively conclude, on this record, whether Plaintiff did nor did not exhaust.

**B. Lack of "Personhood"**

7

The individual Defendants next contend that they are entitled to summary judgment on Plaintiff's claims brought pursuant to 42 U.S.C. § 1983 because, "to the extent [Plaintiff] has asserted these claims against Defendants in their official capacities," Defendants are not "persons." (Dkt. No. 26-1 at 6 of 25.) While Defendants may be correct, it is of no import–Plaintiff specifically states in his Complaint that he is suing the individual Defendants in their individual capacities. (See Dkt. No. 1 at 2 of 12.)

## C. The Merits of Plaintiff's Federal Claims

Defendants also seek summary judgment on the merits of Plaintiff's claims; Defendants assert that Plaintiff "has not alleged sufficient facts to establish he was subjected to cruel and unusual punishment in violation of his Eighth Amendment rights." (Dkt. No. 26-1 at 8 of 25.)

### 1. Use of Excessive Force (Sixth Cause of Action)

In Plaintiff's sixth cause of action, Plaintiff alleges that Defendant King used excessive force against Plaintiff by employing a "forced cell extraction team" when the incident with Aranda had been over for approximately eleven to twelve hours. (Dkt. No. 1 at 10 of 12.) Plaintiff states in his Complaint, "Force may be used to maintain order in prison but that does not mean that anything goes or that I have to be put in [the] chair just because I misbehaved." (Id.)

To establish an Eighth Amendment excessive force claim against a prison official, an inmate must satisfy a two-pronged standard comprised of both a subjective inquiry (whether the defendant acted with a sufficiently culpable state of mind) and an objective inquiry (whether the force applied was objectively harmful enough to amount to a constitutional violation). Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). The subjective component requires an inmate to demonstrate that the force used by the officer inflicted unnecessary and wanton pain and suffering, a question that turns on "whether force

8

was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).[1] Factors the court should consider in determining whether a prison official acted maliciously and sadistically include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7; see also Williams, 77 F.3d at 762.

To prove the objective component of an excessive force claim, an inmate "must show that correctional officers' actions, taken contextually, were 'objectively harmful enough' to offend 'contemporary standards of decency.'" Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998) (quoting Hudson, 503 U.S. at 8). The objective component is not nearly as demanding as the subjective component because "[w]hen prison officials maliciously and sadistically use force to cause harm, . . . contemporary standards of decency always are violated . . . whether or not significant injury is evident." Wilkins v. Gaddy, 559 U.S. 34, 36 (2010.)

In the instant case, Plaintiff's contention that force should not have been used to enter his cell centers on Plaintiff's claim that the "incident was already over." (Dkt. No. 1 at 10 of 12.) King states in his Affidavit that he worked the night shift at Lieber on October 14, 2010, and when he arrived for his shift, he "was informed that Battle was to be placed in the restraint chair for throwing juice at Sergeant Justin Aranda's chest and face during lunch." (King Aff. ¶¶ 8-9.) King also states that, per SCDC policy, "Major Nettles authorized the

---

[1]In Wilkins v. Gaddy, 559 U.S. 34 (2010), the Supreme Court abrogated the Fourth Circuit interpretation of Hudson requiring dismissal of excessive force claims in the absence of more than *de minimis* injury.

placement of Battle in the restraint chair," and "Battle was medically cleared by staff to be placed in the restraint chair." (Id. ¶¶ 10-11.) According to King, "Battle refused to comply with orders to place his arms through the flaps so that restraints could be placed on his wrists. Therefore, the Team had to enter Battle's cell in order to place restraints on his wrists and ankles." (Id.) King further describes the incident as follows:

> 14. Upon entering the cell, Battle began to resist by using a homemade shank made of an ink pen, with the ink pen clip sharpened to a point at the end.
>
> 15. Battle repeatedly stabbed Officer Norris in the side with the homemade shank. Officer Norris was wearing a protective vest and did not suffer injury.
>
> 16. Battle did not stop stabbing Officer Norris until the homemade shank broke. Battle then began to punch Officer Norris in the face. Officer Norris was wearing a face shield.
>
> 17. I told Battle to cease punching Officer Norris and administered one shot burst of chemical munitions to Battle's facial area.
>
> 18. The Team then forced Battle to the Floor and placed restraints on his wrists and ankles. The Team did not hit Battle. Battle repeatedly shouted profanity while the restraints were placed on his wrists and ankles.
>
> 19. I did not administer chemical munitions to Battle's facial area after the restraints were placed on Battle's wrists and ankles.
>
> 20. I did not administer chemical munitions to Battle's facial area while he was on the floor.
>
> 21. Battle was then escorted and placed in the restraint chair at approximately 10:30 p.m. without further incident.

(King Aff. ¶¶ 14-21.)

It is undisputed that Plaintiff refused to comply with King's order to come to the flap. (See Dkt. No. 1 at 4 of 12.) Plaintiff also states that he had his "window flap" covered so that King "could not see in [Plaintiff's] cell." (Id.) Although King states in his Affidavit that Plaintiff stabbed Officer Norris with Plaintiff's homemade shank made out of a pen, Plaintiff disputes the word "stab" and insists instead that he was simply "swinging it" at the shield held by

10

Norris. (Dkt. No. 1 at 4 of 12.) Plaintiff admits that he hit Officer Norris in the face one time. (Id.) Even under Plaintiff's version of the events, Plaintiff was not compliant with King's order, and he was combative when the cell extraction team entered his cell, even punching one officer in the face. As noted in Hudson, the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson, 503 U.S. at 7. In this case, there is no evidence that King used force maliciously or sadistically to cause harm. The undersigned therefore recommends granting summary judgment to Defendants on this claim. See Lewis v. Downey, 581 F.3d 467, 476 (7th Cir. 2009) ("Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.... Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger."); Fuentes v. Wagner, 206 F.3d 335, 345-46 (3d Cir. 2000) (finding no evidence that prison officials placed the plaintiff in the restraint chair "maliciously and sadistically to cause harm" even if "prison officials did not perceive him as an immediate threat when they placed him in the chair" because the plaintiff "established at most that prison officials over-reacted to the disturbance that he caused"); Peoples v. Vonmutius, No. 1:08-3977-CMC-SVH, 2010 WL 3782038, at *7 (D.S.C. Sept. 21, 2010) (rejecting the plaintiff's claim of excessive force where extraction team entered the plaintiff's cell after the plaintiff refused "to be 'stripped out' of his cell for an incident which allegedly occurred the day before"); Pugh v. Evans, No. 5:11-CT-3239-D, 2012 WL 6892816, at *3 (E.D.N.C. June 20, 2012) (dismissing the plaintiff's complaint that officers wrongfully placed him in the restraint chair where the plaintiff's allegations "demonstrate that the officers placed him in the restraint chair in an effort to restore order" because the plaintiff "admit[ted] that he used the prison's intercom to complain

11

of issues that were not emergencies"); see also Rodriguez v. Taylor, No. 9:08-01027-RBH, 2008 WL 5244480, at *8 (D.S.C. Dec. 15, 2008) ("Plaintiff's placement in a restraint chair does not in and of itself constitute an excessive use of force, as the use of devices such as restraint chairs or four-point bed restraints have repeatedly been found to be constitutional when used appropriately.").

### 2. Claims Related to Failure to Allow Plaintiff to Wash off Chemical Munitions

Plaintiff's first, second, and ninth causes of action appear related to Plaintiff's contention that he was not allowed to clean the mace off his person. (See generally Compl.) In his first cause of action, against King, Plaintiff asserts that King violated his Eighth Amendment right to be free from cruel and unusual punishment when King "refus[ed] to give [Plaintiff] a shower or to let [Plaintiff] wash out [his] face/eyes before putting [Plaintiff] in the restraint chair." (Dkt. No. 1 at 9 of 12.) Plaintiff also complains in his first cause of action that King violated Plaintiff's Eighth Amendment rights by further refusing to allow Plaintiff to shower "after [Plaintiff] go [out of] the chair 6/7 hours later and stripping [Plaintiff] out for 3 days without soap or a shower." (Id.)

Plaintiff's second cause of action is against Defendant Pittman. (Id.) Plaintiff complains that Pittman denied him medical attention. (Id.)

Finally, in Plaintiff's ninth cause of action, Plaintiff asserts that King and Pittman were deliberately indifferent "in requiring Plaintiff to return to his cell without first cleaning off chemicals." (Dkt. No. 1 at 10 of 12.)

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104 (internal citations omitted). To prevail on an Eighth Amendment deliberate indifference claim, "a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need

12

was sufficiently serious, and (2) that subjectively the prison officials acted with a sufficiently culpable state of mind." Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998) (internal quotation marks and citations omitted). The first element "is satisfied by a serious medical condition," while the second element "is satisfied by showing deliberate indifference by prison officials." Id. It is well-settled that mere negligence does not constitute deliberate indifference. Estelle, 429 U.S. at 105-06; Grayson v. Peed, 195 F.3d 692, 695-96 (4th Cir. 1999); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (holding that "[d]isagreements between an inmate and a physician over the inmate's proper medical care" are not sufficient to raise an Eighth Amendment claim pursuant to § 1983).

No discussion of Plaintiff's first, second, and ninth causes of action would be complete without reference to the Fourth Circuit case of Williams v. Benjamin, 77 F.3d 756 (4th Cir. 1996). In Williams, the Fourth Circuit addressed a prisoner plaintiff's claim that his constitutional rights were violated when corrections officers "sprayed him with mace, confined him in four-point restraints on a bare metal bed frame and, while refusing to allow him to wash off the mace, continued the confinement for more than eight hours, without providing him the benefit of medical care or the use of a toilet." Williams, 77 F.3d at 759. Although the Fourth Circuit concluded that the initial application of mace did not constitute cruel and unusual punishment, the court stated that "[t]he need . . . for the imposition of four-point restraints is not as evident as was the need for the initial application of mace." Id. at 763. Still, the Fourth Circuit concluded that the "initial decision to impose four-point restraints, in itself," did not "evidence[] a sadistic or malicious intent to punish" the plaintiff because "[w]hen the officers decided to confine [the plaintiff] in the restraints, only minutes had elapsed since the disturbance had begun, [the plaintiff] was still 'hollering,' and it was not obvious that the disturbance had ended." Id. at 764. The Fourth Circuit further noted that while "although closing the food service windows may have been all that was necessary to

stop the inmates from throwing liquids outside their cells, inmates cannot be allowed to dictate whether their cell windows remain open or closed." Id.

The Fourth Circuit then turned to the "most difficult issue," which was "whether confining [the plaintiff] in four-point restraints for eight hours, without permitting him to wash off the mace, use a toilet or receive medical attention, could constitute an Eighth Amendment violation." Id. The Fourth Circuit stated,

> [O]n the present record, the only "need" for force and the only "threat" the defendants perceived justifying the extended confinement was that occasioned by the original throwing of liquids. They offer no evidence to dispute Williams' affidavit that his long confinement without being able to wash off the mace caused "immense" pain. Nevertheless, the defendants maintain that the decision to confine Williams for eight hours without permitting him to wash or to use the toilet was a constitutionally permissible "exercise of official discretion." Maybe so. Certainly we afford prison administrators "discretion" to determine what is necessary for the "prison's internal security." Whitley, 475 U.S. at 321, 106 S.Ct. at 1085. Moreover, when, as here, prison administrators initially apply force in a good faith effort to maintain discipline, "[h]ow long restraint may be continued calls for the exercise of good judgment on the part of prison officials." Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir.1991), cert. denied, 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). However, the Supreme Court has specifically reminded us that the "deference" that is afforded to prison administrators "does not insulate from review actions taken in bad faith and for no legitimate purpose." Whitley, 475 U.S. at 322, 106 S.Ct. at 1085. Deference to prison officials does not give them constitutional license to torture inmates. See Wilkerson v. Utah, 99 U.S. 130, 136, 25 L.Ed. 345 (1878).
> . . .
> Although great deference should be afforded prison officials, it is difficult to conceive of a legitimate purpose for refusing to allow Williams to wash and denying him medical attention, particularly when his confinement in restraints lasted for such an extended period of time. After the guards had imposed the restraints on the prisoners, the immediacy of the disturbance was at an end. In such a circumstance, the unnecessary infliction of continued pain throughout a prolonged time period clearly supports an inference that the guards were acting to punish, rather than to quell the disturbance. See United States v. Cobb, 905 F.2d 784, 789 (4th Cir.1990) ("[P]unitive intent behind a defendant's use of force may be inferred when the force is not reasonably related to a legitimate nonpunitive governmental objective.") (quotations omitted), cert. denied, 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991).
> The record at present contains no reason for the guards' refusal to permit Williams to wash, no evidence that Williams was not in the "immense

14

pain" he alleges, and no justification for the extended period of time Williams was left in the restraints. The award of summary judgment on this record would create a harmful precedent. It would establish that whenever any inmate causes a disturbance by throwing water or something similar at a guard, and refuses to obey a further command, guards can-without fear of violating the Constitution-spray an inmate in the face with mace and then confine him in four-point restraints for an extended period of time without permitting him to wash or use the toilet, without fumigating the cell, and without allowing him the benefit of medical attention of any kind. Although the officers' conduct here may ultimately be held not to violate the Eighth Amendment, we are unable to rule that the record, at this juncture, viewed in the light most favorable to Williams, does not support a "reliable inference of the wanton infliction of pain." Whitley, 475 U.S. at 322, 106 S.Ct. at 1085.

Williams, 77 F.3d at 764-65.

Plaintiff's allegations in his first, second, and ninth causes of action are very similar to the allegations the plaintiff in Williams made. See Williams, 77 F.3d 756. One thing the Williams court did not analyze, however, is the issue of qualified immunity. See Williams, 777 F.3d at 771 (Hamilton, J., concurring). The doctrine of qualified immunity protects governmental officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, this doctrine "protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" Merchant v. Bauer, 677 F.3d 656, 661 (4th Cir. 2010) (quoting Saucier v. Katz, 533 U.S. 194 (2001)). When an official properly asserts the defense of qualified immunity, the official is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established, such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). With respect to the second prong, the court "must

consider whether the constitutional right violated 'was clearly established in the specific context of the case–that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" Merchant, 677 F.3d at 662 (quoting Figg v. Schroeder, 312 F.3d 625, 635 (4th Cir. 2002)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

In the instant case, the undersigned recommends granting summary judgment to King and Pittman on Plaintiff's first, second, and ninth causes of action because they are entitled to qualified immunity. As a preliminary matter, the instant case is distinguishable from Williams. The plaintiff in Williams was denied medical care, but in the instant case, Plaintiff himself alleges that, after he was placed in the restraint chair, Nurse Pittman was checking his restraints when Plaintiff asked her to wipe the mace from his eyes. (See Dkt. No. 1 at 5 of 12.) Plaintiff alleges that Pittman "told [him] 'no'" and to "sit still for 30/45 minutes and it would cool down." (Id.) Defendants attached Pittman's Affidavit to their Motion for Summary Judgment. (See Dkt. No. 26-9.) Although Pittman has no personal recollection of the incidents of October 14, 2010, she states,

> 8. Per SCDC policy, before an inmate can be placed in the restraint chair, medical staff must review the inmate's medical file to determine whether the inmate is mentally and physically able to be placed in the restraint chair.
>
> . . . .
>
> 13. Immediately after an inmate was safely secured in the restraint chair, policy states for medical staff to perform a medical assessment of the inmate for injuries.
>
> 14. I always checked the restraints to make sure they were not excessively tight.
>
> 15. I always listened to the inmate's lungs to ensure that the inmate was evenly breathing.

16

16. If chemical munitions had been discharged, I always told the inmate to calm down and wait 30-45 minutes for the pain of the chemical munitions to subside.

17. Attempting to wipe or dab chemical munitions from an individual would only aggravate the condition and provide no relief.

18. Applying water to the chemical munitions would provide no relief.

19. The particular chemical agent used on Battle improves with time. The only relief is to allow time to pass.

20. If I determined that the inmate had no general injuries other than discomfort from use of the control device and chemical munitions, and that use of the restraint chair would not threaten the health of the inmate, I medically cleared the inmate.

21. After medically clearing the inmate, the security staff would order me to return to the medical unit.

(Pittman Aff. ¶¶ 8, 13-21.) Another factor that distinguishes the case *sub judice* from

Williams is the evidence presented by Defendants that "[a]ttempting to wipe or dab chemical

munitions from an individual would only aggravate the condition and provide no relief."

(Pittman Aff. ¶ 17.)

In addition to the fact that the instant case is distinguishable from Williams, the

undersigned concludes that, assuming–without deciding–that the actions of Pittman and

King violated Plaintiff's constitutional rights, it would not have been clear to reasonable

SCDC employees that the "conduct in which [they] allegedly engaged was unlawful in the

situation [they] confronted." Merchant, 677 F.3d at 662. In Peoples v. Vonmutius, No. 1:08-

3977-CMC-BHH, 2010 WL 3782038 (D.S.C. Sept. 21, 2010), a case factually similar to the

instant case, Judge Currie noted that the plaintiff did not deny that his condition was

evaluated by a nurse, who wiped his face with a wet paper towel after he had been maced.

Peoples, 2010 WL 3782038, at *4 n.9. Judge Currie stated, "Plaintiff's claims relating to the

further actions of 'Defendants' regarding a purported failure to allow him to wash the mace

17

from his face would, at most . . . raise a claim of negligent action, which is not actionable under § 1983." Id. Claims such as Plaintiff's have been repeatedly rejected. See Mann v. Failey, No. 0:11-2232-RMG, 2013 WL 841374, at *4-5 (D.S.C. Mar. 6, 2013) (distinguishing Williams in a case where the plaintiff alleged the defendants placed him in a restraint chair for six hours and did not allow him to wash off the chemical munitions); see also Jackson v. Morgan, 19 Fed. App'x 97, 102 (4th Cir. 2001) (distinguishing Williams because, inter alia, the chemical spray in Williams was tear gas, whereas the defendants in Jackson employed pepper spray: "Pepper spray is a milder irritant and is employed to avoid physical confrontation among inmates and guards; whereas CS tear gas was used primarily as a weapon with greater consequences and required more thorough decontamination.").[2] The undersigned therefore recommends granting summary judgment to Defendants on Plaintiff's first, second, and ninth causes of action.[3]

### 3. Claim Against the South Carolina Department of Corrections

Plaintiff named SCDC as a Defendant in the instant case, though he did not specifically list SCDC in the "Claims for Relief" section of his Complaint. (See Dkt. No. 1 at 9-10 of 12.) Plaintiff does, however, state (verbatim),

---

[2]The chemical munition used in the instant case was MK-9. (See Dkt. No. 26-7.)

[3]On or about May 17, 2013, Plaintiff filed a Motion to Amend his Complaint; Plaintiff seeks to add Defendant Nettles to the instant case because Nettles "apparently gave Lt. King an order to put [Plaintiff] in [the] restraint chair." (Dkt. No. 45 at 1.) As the Fourth Circuit stated in Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986), "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." In the instant case, the only allegation Plaintiff makes against Nettles is that Nettles gave the order to place Plaintiff in the restraint chair. (See Dkt. No. 45.) Such an allegation is insufficient to state a claim for violation of Plaintiff's constitutional rights. See Rodriguez v. Taylor, No. 9:08-01027-RBH, 2008 WL 5244480, at *8 (D.S.C. Dec. 15, 2008) ("Plaintiff's placement in a restraint chair does not in and of itself constitute an excessive use of force . . . ."). Because Plaintiff's proposed amendment is futile, the undersigned therefore recommends denying Plaintiff's Motion to Amend (Dkt. No. 45).

> Plaintiff request that this . . . court . . . issue an injunction ordering defendant SCDC to start using decon chemical to neutralize mace in inmates face if he is put in chair or some other method and to give a[n] inmate a shower if he has mace over him and is about to be put in chair.

(Dkt. No. 1 at 11 of 12.)

Plaintiff's claim against SCDC fails.[4] The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. art. XI. Sovereign immunity protects both the State itself and its agencies, divisions, departments, officials, and other "arms of the State." See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); see also Regents of the Univ. of California v. Doe, 519 U.S. 425, 429 (1997).

As a state agency, SCDC is an arm of the State of South Carolina. See Will, 491 U.S. at 70. As such, the Eleventh Amendment protects SCDC from suit whether money damages or injunctive relief is sought. See Alabama v. Pugh, 438 U.S. 781, 782 (1978). Although exceptions to a state's sovereign immunity exist, no exception applies here. Cf. Virginia v. Reinhard, 568 F.3d 110, 115 (4th Cir.2009) (discussing Congressional abrogation, waiver, and the *Ex Parte Young* doctrine) (citing Ex Parte Young, 209 U.S. 123 (1908)); see also Virginia Office for Protection & Advocacy v. Stewart, 131 S. Ct. 1632, 1638 (2011) (the *Ex Parte Young* doctrine "rests on the premise . . . that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for

---

[4]The undersigned further notes that the South Carolina Department of Corrections is not a "person" within the meaning of 42 U.S.C. § 1983, and that Plaintiff sued King and Pittman in their individual capacities. See Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 617 (2002); see also Brooks v. Pembroke City Jail, 722 F.Supp. 1294, 1301 (E.D.N.C.1989) ("Claims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit.").

sovereign-immunity purposes. The doctrine is limited to that precise situation, and does not apply when the state is the real, substantial party in interest . . . .").[5]

**D. Plaintiff's State Claims**

For the reasons set forth herein, the undersigned recommends granting summary judgment to Defendants on all of Plaintiff's federal claims. Plaintiff has, however, attempted to assert the following state law claims: (a) a cause of action for gross negligence against King (third cause of action); (b) causes of action for gross negligence and negligence against Pittman (fourth and fifth causes of action); (c) a cause of action against King for the "tort of excessive force under the law of South Carolina" (seventh cause of action); and (d) a cause of action against King for assault and battery. (See generally Compl.)

Pursuant to 28 U.S.C. § 1367, a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." Carlsbad Technology, Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009). Nonetheless, "the strong federal custom . . . has been to dismiss those claims in order to permit state courts to decide their own law, as is their prerogative." United States ex rel. Scott v. Metropolitan Health Corp., 375 F.Supp.2d 626, 647 (W.D. Mich. 2005). "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). Because the undersigned recommends dismissal of all of

---

[5]In Stewart, 131 S. Ct. 1632, the Supreme Court rejected the Fourth Circuit's conclusion in Reinhard, 568 F.3d 110, that the *Ex Parte Young* doctrine did not permit suit by a state agency.

Plaintiff's federal claims, the undersigned also recommends dismissal of Plaintiff's state law claims.

## **CONCLUSION**

Wherefore, it is RECOMMENDED that Defendants' Motion for Summary Judgment (Dkt. No. 26) be GRANTED as to all of Plaintiff's federal claims, and that Plaintiff's state law claims be DISMISSED. It is further RECOMMENDED that Plaintiff's Motion to Amend (Dkt. No. 45) be DENIED.

IT IS SO RECOMMENDED.


s/Bruce Howe Hendricks
United States Magistrate Judge

July 31, 2013
Charleston, South Carolina


**The parties' attention is directed to the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).